**Bruce and Mary Ann FEIRSON, Plaintiffs,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**No. CIV.A. 01–0905(JDB).**

United States District Court, District of Columbia.

March 30, 2004.

Frank James Eisenhart, James Gregory
Dyer, Dechert Price & Rhoads, Washing-

ton, DC, Brennan J. Torregrossa, Dechert LLP, Philadelphia, PA, for plaintiffs.

David A. Jackson, Office of Corporation Counsel, D.C., Washington, DC, Thomas Michael Hogan, Hogan & Heald, Fairfax, VA, for District of Columbia and the physician Defendants.

## MEMORANDUM OPINION

BATES, District Judge.

Presently before the Court in this civil rights action brought by plaintiffs Bruce and Mary Ann Feirson pursuant to 42 U.S.C. § 1983 and under the common law of the District of Columbia is the motion of defendant District of Columbia ("the District") for summary judgment.[1] The District moves for summary judgment on Sgt. Feirson's common law and § 1983 claims, and on Mary Ann Feirson's common law claim for loss of consortium. For the reasons that follow, the Court will grant in part and deny in part the District's motion.

## BACKGROUND

This case arises out of Sgt. Bruce Feirson's participation in an Armament Systems Proficiency ("ASP") training session conducted by the Metropolitan Police Department ("MPD") on April 27, 2000. The ASP training, which instructs MPD officers in the use of the ASP baton, consists of classroom instruction and testing, physical conditioning exercises and drills, and a "combat" or "attack" exercise. The combat exercise portion of the ASP training requires a trainee to engage his training instructor, who plays the role of a violent suspect, in physical combat and to use the ASP baton to defend himself. Bruce Feir-

son was injured while participating in the combat exercise portion of ASP training.

The Feirsons filed suit against the District, *inter alia*, on April 26, 2001. Sgt. Bruce Feirson brings two counts against the District, the first for violating his constitutional rights, privileges, and immunities under the Fourth, Fifth, and Fourteenth Amendments by intentionally causing the use of excessive and objectively unreasonable force against him (Count I, seeking relief under 42 U.S.C. § 1983), and the second for common law liability for the injuries he sustained from the ASP training (Count II, brought under the laws of the District of Columbia). Mary Ann Feirson brings a claim for loss of consortium against the District (Count III).

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

---

1. Plaintiffs have also sued Michelle Smith–Jefferies, M.D., Craig Thorne, M.D., and Taunya Brownlee, M.D. (together the "physician defendants"), and John/Jane Does Nos. 1–10 for liability for the injuries sustained by Sgt. Feirson. Additional proceedings have been scheduled on the motion of the physician defendants for summary judgment. None of the John/Jane Doe defendants has been served to date.

material fact." *Id.* (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505.

### ANALYSIS

**I. Common Law Claims: Notice Under D.C.Code § 12–309**

In order to maintain a common law tort claim against the District, a plaintiff must satisfy the mandatory notice requirement set forth in D.C.Code § 12–309 (2001), which states:

An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or [his] attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

The primary purpose of § 12–309 is to provide the District with sufficient notice to allow it to quickly investigate before evidence becomes lost or witnesses unavailable; correct hazardous or potentially hazardous conditions; and settle meritorious claims. *See Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C.1981); *see generally* H.R.Rep. No.2010, 72d Cong., 2d Sess. (1933) (describing purposes of statute). The District asserts that Sgt. Feirson failed to provide the requisite notice under § 12–309. Sgt. Feirson concedes that he never gave notice to the Mayor directly, but contends that he provided sufficient notice through written reports by or to MPD, including his filing of a PD 42 injury report on April 28, 2000, and the cumulative collection of police reports that include Sgt. Feirson's New Injury Questionnaire (April 28, 2000), Lt. Rodman's Supervisor's Report of Accident (PD 839) dated May 2, 2000, and Lt. Rodman's May 4, 2000 Memorandum to the Commander, Seventh District, concerning the event.

Sgt. Feirson filed a PD 42 report, the Metropolitan Police Department's Injury or Illness Report, on the day after the ASP training. In order to provide sufficient notice to the District under § 12–309, the police report must contain the same information that is required in any other notice given under the statute; it must include the approximate time, place, cause, and circumstances of the injury or damage. *See Doe v. District of Columbia*, 697 A.2d 23, 27 (D.C.1997). The parties do not dispute that the PD 42 is a report in writing by the Metropolitan Police Department in the regular course of duty. The District argues, however, that the PD 42 does not provide the District with suffi-

cient notice as to the cause and circumstances of the injury.

■ The District of Columbia Court of Appeals has explained that, under § 12–309,

a written notice or police report must disclose both the factual cause of the injury and a reasonable basis for anticipating legal action as a consequence. Such notice would suffice, therefore, if it either characterized the injury and asserted the right to recovery, or without asserting a claim described the injuring event with sufficient detail to reveal, in itself, a basis for the District's potential liability.

*Washington v. District of Columbia*, 429 A.2d 1362, 1366 (D.C.1981) (en banc). Furthermore, police reports satisfy the § 12–309 requirement only if they actually notify the District of the injury claimed. *See Powell v. District of Columbia*, 645 F.Supp. 66, 70 (D.D.C.1986) (quoting *Jenkins v. District of Columbia*, 379 A.2d 1177, 1178 (D.C.1977)).

Certainly, the PD 42 injury report contains sufficient information on the time, place, cause and circumstances of Sgt. Feirson's injury. The PD 42 does not expressly assert a right to recovery, however, and whether it serves as sufficient notice to the District therefore depends on whether its description of the injuring event is sufficiently detailed to indicate a basis for the District's potential liability for the tort claim that plaintiff now asserts against the District. The District of Columbia Court of Appeals has instructed that " § 12–309's requirements with respect to the *content* of the notice ... are to be interpreted liberally, and in close cases we resolve doubts in favor of finding compliance with the statute." *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C.1995).

In Count II of his Complaint, Sgt. Feirson asserts a claim against the District "[u]nder the statutes, common law and/or case law of the District of Columbia ... for the injuries he has sustained, and for all his resulting damages." Compl. ¶ 42. With respect to a description of the factual cause of those injuries, Sgt. Feirson's PD 42 report clearly states: "While fighting during the combat phase of training I sustained an injury to my lower back and neck." Pl. Opp., Ex. U at 1. The report then details the effects of the injury: "I have numbing and weakness in my right hand and pain in my lower back and buttocks running down to my left leg." *Id.* With respect to revealing a basis for the District's liability, Sgt. Feirson states in the PD 42 that he "was assigned" to the ASP training, indicating that the MPD was responsible for his participation in the training. The report also states that "[d]uring the ASP training, Sergeant Yarborough [sic], of the training staff, stated to the class, 'Those of you that can't pass this course need to retire from the police department. You need to find something else to do.'" *Id.* This reported statement certainly intimates potential liability on the part of the District to the extent that it suggests that the ASP training and fighting, in which Sgt. Feirson was injured, was a condition of his continued employment by the MPD.

■ Upon review of Sgt. Feirson's PD 42 report, generated in the regular course of his MPD duty, and in light of the controlling law, the Court concludes that the PD 42 is, by itself, sufficient notice under § 12–309 because it describes the injuring event with sufficient detail to reveal a basis for the District's potential liability for the physical injuries which Sgt. Feirson allegedly sustained in the ASP training. Here, moreover, that conclusion is bolstered by the additional MPD reports, in-

cluding the description of the cause of injury as "Assault—Intentional" in the New Injury Questionnaire,[2] Lt. Rodman's reference to other serious injuries in the ASP training and the need for change, and Lt. Rodman's stated concern over Sgt. Yarbaugh's "pass the course or retire" comment. The Court will therefore deny the District's motion for summary judgment on Sgt. Feirson's common law claim (Count II), and will accordingly also deny summary judgment on Mary Ann Feirson's common law claim for loss of consortium (Count III).

## II. Availability of Punitive Damages

■ The Feirsons seek punitive damages from the District. *See* Compl. at 12. The District argues that punitive damages are not available against it. It is well established that, under § 1983, municipalities are immune from punitive damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Butera v. District of Columbia,* 235 F.3d 637, 658 (D.C.Cir. 2001). Because the District is a municipal corporation, *see* D.C.Code § 1–102 (2001), there is no question that punitive damages are not available on Sgt. Feirson's § 1983 claim against the District.

■ Although punitive damages are generally not available against the District under District of Columbia law, they may be awarded when warranted by "extraordinary circumstances." *See Smith v. Dis-*

*trict of Columbia,* 336 A.2d 831, 832 (D.C. 1975); *Butera,* 235 F.3d at 658. The District of Columbia Court of Appeals has explained that allowing punitive damages against the District makes little sense given that the justification for a punitive award is to punish the offender, and that the people who would bear the burden of the punishment of a municipality would be its citizens, the same group expected to benefit from the punishment of the wrongdoer. *Smith,* 336 A.2d at 832. Illustrative instances of "extraordinary circumstances" where punitive damages might be warranted against a municipality, therefore, include circumstances "where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries" or "where a municipality or its policymakers have intentionally adopted the unconstitutional policy that caused the damages in question." *Butera,* 235 F.3d at 658, quoting *Daskalea v. District of Columbia,* 227 F.3d 433, 447 (D.C.Cir.2000).

■ The Feirsons argue that the facts they have presented to the Court demonstrate that "a reasonable jury could conclude that the District *intentionally* adopted and maintained and/or was *deliberately* indifferent to a policy and practice of intentionally, unreasonably, and unconstitutionally assaulting officers, including Sgt. Feirson, during ASP training", Pl. Opp. at 33 (emphasis in original), and that

---

**2.** The District argues that the New Injury Questionnaire does not constitute a "report in writing by the Metropolitan Police Department, in regular course of duty." The District notes that the New Injury Questionnaire is a report submitted to the Police and Fire Clinic ("PFC") for medical treatment purposes and is not a police report. Furthermore, the New Injury Questionnaire is written on the letterhead of PFC Associates. Because PFC is not an agency of the District, the District contends that it cannot re-

ceive § 12–309 notice on behalf of the District. The Court need not resolve whether the New Injury Questionnaire qualifies as a police report, however, because it concludes that Sgt. Feirson provided the District with sufficient notice on the basis of reports that the District concedes are police reports for the purpose of § 12–309 notice ("the only reports appropriate for this Court to consider are [p]laintiff's PD 42 and Lieutenant Rodman's May 5, 2000 memorandum." Def. Reply at 6).

therefore punitive damages could be awarded in this case. The District contends that the Feirsons have failed to show extraordinary circumstances entitling them to punitive damages and that "[n]o trier of fact could reasonably find an intentional adoption of an unconstitutional policy on the record in this case." Def. Reply at 11. The Court concludes *infra* that the alleged assault on Sgt. Feirson does not rise to the level of a constitutional violation. It follows inexorably, then, that the Court must also conclude that the Feirsons have failed to make a showing of the requisite extraordinary circumstances warranting the availability of punitive damages in this case. The record simply will not support a conclusion by a reasonable jury that the District intentionally or with deliberate indifference adopted an unconstitutional policy of intentional, unreasonable assaults on officers as part of the ASP training, and hence punitive damages are not available.

## III. Constitutional Claims Under 42 U.S.C. § 1983

 In addition to his state law claim, Sgt. Feirson brings a claim against the District pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

In order to state a claim against the District of Columbia under § 1983 for the unconstitutional conduct of its employees, a plaintiff must allege that he was deprived of his constitutional rights, and that this deprivation was caused by a policy, custom or practice of the District of Columbia, or that a single "municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *See Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Here, Sgt. Feirson claims violations of his Fourth Amendment right to be free from unreasonable seizures and his Fifth Amendment substantive due process right to be free from the use of excessive force. He further claims that these constitutional violations either were the product of a policy or practice of the District or were a result of the District's deliberate indifference to the unconstitutional conduct and its obvious consequences. The District responds that Sgt. Feirson's Fourth and Fifth Amendment rights were not violated, and that even if they were, the District should not be held liable for the violations.

### A. Unconstitutional Seizure Under the Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons ... against unreasonable ... seizures ...." U.S. Const. Amend. IV. The Fourth Amendment applies in situations outside the criminal law context. *See O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) ("Searches and seizures by government employers or supervisors ... are subject to the restraints of the Fourth Amendment."). A person is "seized" within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free

to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)(quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

Plaintiff avers that Sgt. Feirson's person was effectively "seized" by the District in violation of the Fourth Amendment when he was given multiple, direct instructions to attend the ASP training; required to enter a ring formed by other officers; surrounded and restrained by those officers; and, while so restrained, intentionally and severely battered by another officer. Pl. Opp. at 38–39. The District contends that given the facts, a reasonable person in Sgt. Feirson's circumstance could not have believed that he was not free to leave the ASP training exercise and that the District's actions thus do not constitute an unreasonable seizure in violation of the Fourth Amendment.

According to his deposition testimony, Sgt. Feirson asked to be excused from the ASP training when he learned that he had been scheduled to participate in it. Feirson Dep. (Pl.Opp., Ex. 24) at 36–42, 94–103. Sgt. Feirson had two prior back surgeries as a result of injuries sustained in the performance of duty. *Id.* at 9. His request was refused by his commanding officer Lt. Thomas Rodman ("Lt.Rodman"), who gave Sgt. Feirson a direct oral and written order, from an Assistant Chief of Police, to attend the ASP training. *Id.* at 36–42, 94–103.

Sgt. Feirson argues that an order that is given by a superior officer in the MPD is an imperative because the MPD is a paramilitary organization in which orders are commands that must be followed. Sgt. Feirson testified that "[i]t is a serious offense to disobey a direct order, and it could include termination or very stern disciplinary action." *Id.* at 38–39; *see also* Cockett Dep. (Pl.Opp., Ex. 19) at 258–60.

The District notes, however, that Sgt. Feirson has testified that he knows of no member of the MPD who was fired for not participating in ASP training. Def. Mot. Summ. J., St. of Mat. Fact ¶ 35, referencing Feirson Dep. at 109.

Sgt. Feirson also proffers evidence that, at the training session on April 27, 2000, he was forced to enter a ring of fellow officers during the combat phase of training, where he was hit, punched, and kicked by an ASP trainer. Feirson Dep. at 44–61, 114–116. While attempting to survive the exercise, Sgt. Feirson tried to clutch the attacking trainer to avoid being beaten. When he tried to do this, however, Sgt. Yarbaugh, the supervisor for the training, would stop the training, including the stopwatch used to time the exercise, separate Sgt. Feirson from his assailant, and then re-start the combat session. *Id.* at 51–52, 116. When Sgt. Feirson attempted to move away from the attacker to avoid the blows, the officers forming the ring around him would push him back into the exercise with the rubber shields that they were holding. *Id.* at 51–52. The combat session with Sgt. Feirson concluded after more than a minute when Officer DeOleo, the attack instructor, said "you can't take any more, you've had enough." *Id.* at 52–53.

■ In considering whether Sgt. Feirson was seized in violation of the Fourth Amendment, the Court must look at all the circumstances surrounding the incident to determine whether a reasonable person in Sgt. Feirson's circumstances would have believed that he was not free to leave. *See Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). In *Fournier v. Reardon,* 160 F.3d 754, 757 (1st Cir. 1998), the plaintiff was a ten-year veteran of the county sheriff's department who claimed that his Fourth Amendment rights had been violated when he was punished

for violating protocol while attending a basic training academy run by the sheriff's department. The plaintiff's punishment included being handcuffed, placed under house arrest, having his written reports placed in his mouth, and being ordered to return to the classroom while still in handcuffs. In finding against the plaintiff, the First Circuit reasoned that although there could have been negative consequences for the plaintiff's continued employment as a corrections officer had he objected to being handcuffed, "the possible effect that refusing to be handcuffed may have had on his employment status is not an issue for us to consider." 160 F.3d at 757. The First Circuit noted that the plaintiff had submitted to being handcuffed and that, while the record may have reflected that he "was the subject of improper hazing, which might give rise to a state law claim based on tort or employment theories," a reasonable person would not believe that the plaintiff was not free to call an end to the house arrest and have the handcuffs removed. *Id.*

■ Likewise, here, Sgt. Feirson submitted to attending the ASP training session and submitted to entering the combat ring. Although his refusal to do so could have resulted in negative consequences for his continued employment, as the First Circuit observed in *Fournier*, that is a concern that does not impact whether he was subjected to an unconstitutional seizure in violation of the Fourth Amendment. "The Fourth Amendment, like the other central provisions of the Bill of Rights that loom large in our modern jurisprudence, was designed, not to prescribe with 'precision' permissible and impermissible activities, but to identify a fundamental human liberty that should be shielded forever from government intrusion." *Oliver v. United States,* 466 U.S. 170, 186, 104 S.Ct. 1735, 80 L.Ed.2d 214

(1984). With respect to the argument that Sgt. Feirson was restrained and effectively "seized" during the time that he spent in the combat ring, the Court concludes that, like the plaintiff in *Fournier* who was forcibly restrained by being handcuffed, a reasonable person would have believed that he was free to call an end to the combat—even though he might very well have understood that doing so would lead to embarrassment or "losing face" before his peers, or to employment consequences for failure to complete mandatory training.

Viewing the facts proffered by Sgt. Feirson in the light most favorable to him, the Court concludes that a reasonable person would not believe that Sgt. Feirson was not at *liberty,* setting aside the possible consequences for his employment with the MPD and his social standing among his peers, to refuse to participate in the ASP training, to refuse to enter the combat ring, or to demand an end to the combat exercise. A contrary conclusion might logically mean that many public employees who preferred not to attend mandatory training despite being ordered to do so, could claim a Fourth Amendment violation when they were "forced," reluctantly, to attend over their objections. The Court does not believe that the scope of the Fourth Amendment's protection against unreasonable seizures is that broad.

## B. Use of Excessive Force Under the Fifth Amendment

Sgt. Feirson also advances a separate claim that the District violated his substantive due process right to be free from excessive and unconscionable uses of force by state actors, even if the Court concludes that no seizure in violation of the Fourth Amendment occurred. *See Petta v. Rivera,* 143 F.3d 895, 901 (5th Cir.1998) (". . . we conclude, as have all of the courts

of appeals that have addressed the issue, that a plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right may still state a claim under § 1983 for a violation of his or her ... substantive due process right, and have the claim judged by the constitutional standard that governs that right")(citing cases from the First, Sixth, Ninth, and Eleventh Circuits).

■ With respect to substantive due process doctrine, the Supreme Court has stated,

> We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government....
>
> Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.
>
> ... [F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience....

*County of Sacramento v. Lewis,* 523 U.S. 833, 845–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal citations and quotations omitted). The substantive due process analysis that applies in this case, then, requires the Court to closely examine the circumstances surrounding the use of force to assess whether it constitutes an abuse of power that is shocking to the conscience. *See Lewis,* 523 U.S. at 850, 118 S.Ct. 1708 ("Rules of due process are not, however, subject to mechanical application.... [O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."). Sgt. Feirson claims that the force used against him in the ASP combat training violated his substantive due process rights

because it was grossly excessive in the context of a supposed training exercise. The District counters that the circumstances justified the use and level of force that Sgt. Feirson experienced in the combat ring.

Sgt. Feirson urges the Court to apply the guidelines originally articulated by Judge Friendly in *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), and regarded favorably by the D.C. Circuit as "sensible guidelines, widely adopted by other courts" in *Norris v. District of Columbia,* 737 F.2d 1148, 1150 (D.C.Cir.1984):

> [i]n determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

Sgt. Feirson testified in his deposition that the force used against him included repeated punching and kicking, being kneed, and taking blows all over his body, including his head. Feirson Dep. at 44–61, 114–116. He also proffers the testimony of a training expert that establishes that "the speed, intensity and level of force applied against Bruce Feirson on April 27, 2000 was ... outside the scope of reasonable and effective training practices given the limited amount of training he received, his level of experience (with the ASP), his age and overall physical and mental condition." Exp. Rep. of Michael Krivka (Pl. Opp., Ex. 37) at 3. The force used against Sgt. Feirson in the training attack exercise caused injuries that are "anything be *de minimis* ", Pl. Opp. at 41, and required

spinal surgery, left him with permanent disabilities, and forced him to retire. Pl. Opp., Ex. 9 and Ex. 32. As a result of the injuries Sgt. Feirson sustained in the ASP exercise, he will suffer permanent, intermittent pain. *Id.* Furthermore, Sgt. Feirson asserts that the evidence shows that he was attacked with malice; when he complained to the instructors about the level of force being used against the trainees, the instructor laughed in response, Feirson Dep. at 58; Sgt. Yarbaugh continued to permit Sgt. Feirson's combat session to go on despite Sgt. Feirson's attempts to avoid being hit, *id.* at 51–52; and not only did Sgt. Yarbaugh comment that officers who could not withstand the ASP combat exercise should find another job, Pl. Opp., Ex. 5 at U, but the District's training staff endorses and takes pride in Sgt. Yarbaugh's statements, Washington Dep. (Pl.Opp., Ex. 22) at 57–58.

The District contends that the record evidence establishes that Sgt. Feirson's substantive due process rights were not violated by the District in the ASP combat training. The District notes that Sgt. Feirson was a twenty-year veteran of the MPD who, two months prior to attending the training session, received a complete physical examination that determined that he was fit for duty, Def. Stmt. Mat. Facts ¶¶ 30–31, Feirson Dep. at 23–25, 27, and who considered himself fit for duty at the time of the training, *id.* ¶ 34, Feirson Dep. at 23. During the training, Sgt. Feirson was wearing protective gear. *id.* ¶ 36, Feirson Dep. at 45–46. Sgt. Feirson himself did not believe that his instructors were personally trying to hurt him, *id.* ¶ 37, Feirson Dep. at 50, and when Sgt. Feirson appeared dazed during the combat, the instructor stopped the session, *id.* ¶ 39, Feirson Dep. at 54, 116. The District also notes that the ASP training was not designed to injure or hurt, but to teach the proper use of the ASP as a defensive weapon. Def. Reply at 15.

■ Based on a review of the evidence proffered, and viewing it in the light most favorable to Sgt. Feirson as the Court must on a Rule 56 motion for summary judgment, the Court concludes that there is no genuine issue of material fact on the excessive force issue. The force used on Sgt. Feirson during the combat phase of the ASP training session on April 27, 2000, even though it caused Sgt. Feirson serious injuries, did not rise to the level of a conscience-shocking constitutional violation of his substantive due process rights.

The Supreme Court first articulated the "shocks the conscience" standard in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), where it found that the forced pumping of a suspect's stomach in an attempt to retrieve evidence offended due process as an act violative of the "decencies of civilized conduct." 342 U.S. at 173, 72 S.Ct. 205. The justification for a particular instance of the use of force is important in considering whether it constitutes an abuse of power that shocks the conscience. In *Lewis,* the Court held that in the context of the fatal use of force resulting from a high speed police car chase aimed at apprehending a suspect, "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." 523 U.S. at 836, 118 S.Ct. 1708. In *Norris,* the D.C. Circuit held that "the amount of force required to state a constitutional claim for prison officer battery varies with the justification for that force." 737 F.2d at 1152.

There is no question that the MPD has an important interest in training its officers to use the tools and weapons with which they are equipped in order to carry out their law enforcement duties effective-

ly. While the amount of force used in the ASP combat training and the fact that it caused Sgt. Feirson to suffer serious injuries certainly raises valid questions about the design and execution of the ASP training program and the conduct and sensibilities of the instructors, the evidence fails to raise a genuine issue of material fact with respect to the malice or sadism that Sgt. Feirson argues motivated the use of force against him. *See Norris,* 737 F.2d at 1151 ("The application of force 'maliciously and sadistically for the very purpose of causing harm,' can serve no legitimate governmental objective.")(quoting *Johnson v. Glick,* 481 F.2d at 1033). Indeed, Sgt. Feirson has effectively conceded that there was no intent to injure him and that the exercise was stopped when he appeared dazed. The Court therefore concludes that the force, while it may seem excessive as applied against Sgt. Feirson, still does not rise to a level that "shocks the conscience" when viewed in the context of a combat exercise for MPD officers who were in protective gear. Because the Court concludes that Sgt. Feirson did not experience any violations rising to the level of a deprivation of his constitutional rights, it does not reach the question of the District's liability for the unconstitutional conduct of its employees.

### CONCLUSION

For the foregoing reasons, the Court will deny the District's motion for summary judgment on Sgt. Feirson's common law tort claim against the District (Count II), but concludes that punitive damages are not available against the District for this claim. The Court will also deny the District's motion for summary judgment on Mary Ann Feirson's common law claim for loss of consortium (Count III). The Court will grant, however, the District's summary judgment motion with respect to Sgt. Feirson's § 1983 claims for violations of his constitutional rights (Count I). A separate order accompanies this memorandum opinion.

### ORDER

Upon consideration of the motion for summary judgment filed by defendant District of Columbia ("the District"), the opposition of plaintiffs Bruce and Mary Ann Feirson, the District's reply, and the entire record herein, and for the reasons stated in the Memorandum Opinion issued herewith, it is this 30th day of March, 2004, hereby ORDERED that:

1. The District's motion for summary judgment shall be GRANTED in part and DENIED in part; and

2. Judgment shall be ENTERED in favor of the District and against plaintiff Bruce Feirson on Count I of the Complaint, claiming violations of Bruce Feirson's constitutional rights under 42 U.S.C. § 1983.